JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rito Castro-Parra, | No. CV 07-2090-PHX-PGR (JRI) |
| Plaintiff, | **ORDER** |
| vs. | |
| Corrections Corp. of America, and Teri Jackson, | |
| Defendants. | |

Plaintiff Rito Castro-Parra brought this civil rights action under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), against Corrections Corporation of America (CCA) and Teri Jackson, Medical Director at the Central Arizona Detention Center (CADC), operated by CCA (Doc. #25).[1] Defendants move to dismiss for failure to exhaust administrative remedies and failure to comply with the applicable statute of limitations (Doc. #26). The motion is fully briefed (Doc. ##29, 32).

The Court will grant Defendants' motion.

**I.     Background**

In his Second Amended Complaint, Plaintiff set forth state and federal claims related to the medical care he received while confined in the CADC and the Federal Correctional

---

[1] Plaintiff, who is currently confined in CCA's Northeast Ohio Correctional Center in Youngstown, Ohio, initiated this action *pro se* (<u>see</u> Doc. #1), but he is now proceeding with counsel (Doc. #15).

Institution (FCI) in Allenwood, Pennsylvania, where he was transferred to in mid-2005 (Doc. #25 ¶¶ 5, 26). Plaintiff alleged the following facts:

In November 2003, an unknown medical employee inserted an instrument into Plaintiff's eye and cut it (id. ¶ 25). Plaintiff was immediately hospitalized for several days (id. ¶ 16). In July 2004, he was taken to Dr. Dao, a specialist in Scottsdale, Arizona, who performed corneal-transplant surgery on Plaintiff's eye (id. ¶ 17). Following the surgery, Jackson assumed control of Plaintiff's treatment and informed Plaintiff that she would decide when he would see the specialist again (id. ¶ 18). From July-September 2004, Plaintiff was taken to the Phoenix area for several visits to Dao (id. ¶ 19). In September 2004, Dao diagnosed Plaintiff with secondary glaucoma, a condition that requires regular monitoring and treatment of eye pressure (id. ¶ 20). On September 29, 2004, Dao prescribed certain medications, including Diamox, and rescheduled Plaintiff for a follow-up appointment two weeks later (id. ¶ 21).

Defendants denied Plaintiff access to Dao, or to any other specialist, until January 2005, and Defendants did not provide Plaintiff with the medication that Dao had prescribed during that four-month period (id. ¶ 22). At the January 28, 2005 appointment, Dao wrote in Plaintiff's medical chart a question as to why Plaintiff had not taken Diamox as prescribed, and he noted that four months elapsed since the last visit despite the recommended 2-week follow-up (id. ¶ 23).

Between January and June 2005, Dao recommended that Plaintiff undergo a laser procedure on his eye (id. ¶ 25). During the week of June 30, 2005, before this procedure was performed, Plaintiff was transferred to the FCI in Pennsylvania, a Federal Bureau of Prisons facility (id. ¶ 26).

Upon his arrival at the FCI, Plaintiff was examined by medical personnel and he was referred to an eye specialist (id. ¶ 29). On July 20, 2005, he saw Dr. Ingraham, an opthalmologist, who recommended another corneal transplant (id. ¶ 30). After an October 2005 referral for an outside consultation, Plaintiff saw Dr. Ulrich in December 2005 (id.). In January 2006, Ingraham documented that Plaintiff had a "failed corneal graft" and that a

"re-graft" should be considered (id. ¶ 36). The next month, Ingraham documented that he recommended a repeat graft be performed after Plaintiff's release from prison in a few years (id. ¶ 37). Ingraham's recommendation was adopted by the Federal Bureau of Prisons (id.).

Plaintiff does not know when the loss of his eyesight became permanent and irreversible (id. ¶ 28). But it was in February 2006, when he realized that no medical action would be taken to restore his eyesight (id. ¶ 37). In March 2006, Plaintiff pursued the available administrative remedies by appealing the denial of his request for a corneal transplant (id. ¶ 38). His subsequent appeals were ultimately denied by the Regional Director and the Administrator of National Inmate Appeals (id. ¶¶ 40-41).

In Count I of his pleading, Plaintiff alleged that Defendants were negligent when they allowed an unqualified individual to cut his eye, withheld prescribed medication and treatment, and prevented Plaintiff from seeing the eye specialist (id. ¶¶ 42-45). He further alleged that Defendants negligently failed to timely provide his medical records to medical personnel at the FCI in Allenwood (id. ¶ 48). In Count II, Plaintiff set forth a claim of medical malpractice (id. ¶¶ 50-53). And in Count III, Plaintiff alleged that Defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical needs (id. ¶¶ 54-57).

## II.   Motion to Dismiss

### A.   Defendants' Contentions

Defendants move under Federal Rule of Civil Procedure 12(b)(6) for dismissal on the grounds that (1) Plaintiff failed to properly exhaust all available administrative remedies and (2) Plaintiff's claims are time-barred (Doc. #26).

Defendants contend that Plaintiff failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) (id. at 4). They assert that Plaintiff was housed at two CCA facilities: the CADC from August 25, 2003-April 14, 2005; and the Florence Correctional Center (FCC) from April 14, 2005-June 30, 2005 (id. at 6-7). In support of their nonexhaustion argument, Defendants proffer the affidavits of the Grievance Officers from each of these facilities.

Ryan Henricks, Grievance Officer at CADC, attests that prior to pursuing the formal grievance process, prisoners must use the Informal Resolution Process by filing an Inmate Information Request Form or speaking with staff about an issue (id., Ex. 1, Henricks Aff. ¶¶ 1, 6-7). If the issue is not resolved informally, then the prisoner can file a formal grievance within seven days of the alleged incident (id. ¶¶ 8-9). According to Henricks, the time for filing begins from the date the problem becomes known to the prisoner (id. ¶ 10). The grievance officer must respond to the formal grievance within 15 days (id. ¶ 11); upon receiving the grievance officer's decision, the prisoner has 5 days to submit an appeal to the Warden/Administrator (id. ¶ 12). The Warden/Administrator renders a decision within 15 days (id. ¶ 13). Henricks states that these grievance procedures are outlined in the Inmate Handbook, which is provided to inmates and which Plaintiff received on August 25, 2003 (id. ¶ 5). Henricks further states that all grievances are documented in a "Grievance Log" and copies of grievances are maintained in each prisoner's grievance file (id. ¶ 14). Henricks avers that there is no record that Plaintiff filed a medical care grievance while he was at CADC (id. ¶¶ 16-17). Attached to Henricks' affidavit are a copy of the Inmate Grievance Procedures (id., Attach. A); a copy of the CADC Inmate Handbook (id., Attach. B); and a copy of Plaintiff's August 25, 2003 acknowledgment that he received the Inmate Handbook (id., Attach. C).

Audrey Partain, Grievance Officer at FCC, attests that the same grievance procedures described by Henricks apply to the FCC facility (id., Ex. B, Partain Aff. ¶¶ 1, 4-13). She further attests that Plaintiff received notice of these grievance procedures on April 14, 2005, when he was given the Inmate Handbook, which summarizes the procedures (id. ¶ 5). Partain states that there is no record that Plaintiff filed a medical care grievance while he was at FCC (id. 16-17). Attached to Partain's affidavit is a copy of an updated version of the Inmate Grievance Procedures (id., Attach. A), a copy of the FCC Inmate Handbook (id., Attach. B); and a copy of Plaintiff's April 14, 2005 acknowledgment that he received the Inmate Handbook (id., Attach. C).

Defendants maintain that Plaintiff's failure to initiate and complete the grievance

- 4 -

procedures during his confinement at either CCA facility constitutes a failure to exhaust available remedies (Doc. #26 at 8). They note that Plaintiff's corneal surgery was in July 2004, and he was not transferred to FCI in Allenwood until July 2005—one year later; yet, he filed no grievances prior to his transfer and offers no reason why he could not have begun the grievance process during that time (id.). Defendants state that the Inmate Handbook provides that a transfer to another facility does not excuse an inmate from properly and fully exhausting administrative remedies (id. at 4).[2] Defendants argue that Plaintiff's allegation—that it was not until February 2006 "or sometime thereafter" that he realized no medical attention would be available to restore his eyesight—relates solely to conduct by FCI officials, not conduct by Defendants (id. at 9). And they argue that grievances filed by Plaintiff at FCI do not constitute compliance with the CCA grievance procedures (id. at 10). Because Plaintiff is no longer a CCA inmate and cannot now comply with their grievance policy, Defendants urge the Court to dismiss Plaintiff's claim with prejudice for failure to exhaust (id. at 10).

Defendants' second argument for dismissal is that Plaintiff's case was initiated after the applicable two-year statute of limitations (id.). Defendants assert that the statute of limitations required any suit to be filed by November 2005—two years from the date Plaintiff's eye was cut, and because Plaintiff did not file his Complaint until August 2007, it is time-barred (id. at 10-11). Defendants further assert that even if the statute of limitations began to run at the time Plaintiff was transferred from CCA to FCI—June 2005—his claims are still time-barred because any Complaint should have been filed by June 2007 (id. at 11).

### B.    Plaintiff's Response[3]

Initially, Plaintiff argues that Defendants' Motion to Dismiss is an improper Rule

---

[2] Defendants do not cite to the Inmate Handbook (see Doc. #26 at 4).

[3] The Court issued an Order required under Wyatt v. Terhune, 315 F.3d 1108, 1120 n. 14 (9th Cir. 2003), which informed Plaintiff of his obligation to respond and the evidence necessary to rebut Defendants' contentions (Doc. #28).

1  12(b)(6) motion because Defendants rely on matters outside the pleadings (Doc. #29 at 3).
2  Plaintiff concedes that outside evidence may be considered on an unenumerated Rule 12(b)
3  motion; however, he notes that Defendants bring their motion under Rule 12(b)(6), and it is
4  therefore improper (id.).  Plaintiff also argues that even if the motion were not considered
5  under Rule 12(b)(6), it is nonetheless flawed because numerous facts set out by Defendants
6  are not supported by the evidence attached to the motion (id. at 3-4).

7  With respect to exhaustion, Plaintiff maintains that the PLRA does not apply to
8  Plaintiff's state law claims for negligence and medical malpractice, so those claims may not
9  be dismissed (id. at 5).  He also argues that the PLRA does not bar his Bivens claim because
10 the injury, or incident, giving rise to this action is the permanent and irreversible loss of
11 Plaintiff's eyesight (id.).  Plaintiff was not aware of this injury until he left CCA custody and
12 was in FCI, at which time he pursued the available administrative remedies (id. at 5-6).

13 Plaintiff relies on an unpublished Fifth Circuit case, Allard v. Anderson, 260
14 Fed.Appx. 711 (5th Cir. 2007), to support his contention that he was not required to seek, nor
15 could he have sought, administrative remedies before he knew that his eyesight loss was
16 permanent (id. at 6).  In Allard, a jail inmate was subjected to unsanitary living conditions
17 and exposed to sewage and pesticides but he did not file any grievances at the jail.  Allard,
18 260 Fed.Appx. at 712.  After his transfer out of the jail, he discovered that he had contracted
19 hepatitis C.  Id.  The Circuit Court held that because the inmate learned of his injury when
20 he was no longer at the jail, he had no available remedies to exhaust.  Id. at 714.  Plaintiff
21 argues that he did not become aware of his eyesight loss until he was at FCI; thus, the CCA
22 grievance process was not available to exhaust (Doc. #29 at 7).  He notes that he did not have
23 access to the CCA grievance procedure forms, and CCA did not have authority to hear his
24 grievances following the transfer (id. at 8).  Plaintiff argues that the CCA grievance policy
25 applies only to current inmates, not former (id.).  And he submits that when he became aware
26 of his injury, he pursed the available administrative remedies at FCI (id.).

27 In response to the statute-of-limitations argument, Plaintiff asserts that his claim did
28 not accrue until February 2006, when he knew of the permanent loss of his eyesight (id. at

- 6 -

9-10). He contends that his knowledge that he was having problems with his eye during his time at CCA was not enough to trigger the running of the statute (id. at 9). Plaintiff explains that until February 2006, he was led to believe that he had not yet suffered the loss. Specifically, he cites to the recommendation of Dao to have a laser procedure in 2005, which suggested that his eyesight could be restored (id. at 10-11).

Finally, Plaintiff contends that even assuming that his claim accrued before February 2006, the statute of limitations was equitably tolled during the time he pursued administrative remedies at FCI (id. at 11). Plaintiff states that he filed the instant action just over one year after the final denial of his administrative appeals; therefore, his claims are not time-barred (id. at 11-12).

### C.  Defendants' Reply

Defendants reply and argue that Plaintiff's claim that he exhausted available administrative remedies because he pursued the grievance process at FCI fails because there is no relationship between CCA and FCI (Doc. #32 at 2). They point to Plaintiff's contention that the physicians at FCI made it clear that no effort would be made to restore Plaintiff's eyesight and contend that it is irrational to hold CCA liable for FCI's physicians' decision (id. at 2-3).

Defendants reiterate their argument on exhaustion and add that had Plaintiff initiated the grievance process prior to his transfer from CCA to FCI, CCA would have continued its investigation of the grievance (id. at 4). Defendants assert that for this reason, Plaintiff's transfer does not excuse the failure to exhaust (id.). They rely on Plaintiff's allegations in the Second Amended Complaint, which include claims that he received inadequate care prior to his corneal graft in July 2004 and he was deprived treatment and medication between September 2004 and January 2005 (id. at 4-5). Defendants assert that despite these claims specific to 2004 and 2005, Plaintiff filed no grievances at the time or at all while in CCA custody (id.).

Defendants also argue that Allard v. Anderson, on which Plaintiff relies, is distinguishable from this case because there, the plaintiff did not know of his injuries until

- 7 -

1 after he transferred from the jail facility and when he did attempt to grieve, he was told he
2 could not file grievances because he was no longer an inmate at the facility (id. at 5-6).
3 Defendants state that here, Plaintiff knew of his injuries and had every opportunity to file a
4 grievance but failed to do so (id. at 6).

5 In support of the statute-of-limitations argument, Defendants again point to the
6 Second Amended Complaint and Plaintiff's allegations that he received inadequate care in
7 2004 and through January 2005 (id. at 7). They contend that these statements demonstrate
8 that Plaintiff became aware of the facts giving rise to his claim at these times. Defendants
9 assert that Plaintiff's contention that his claim did not start to accrue until he learned he
10 would receive no additional treatment ignores his allegations showing that he was aware of
11 his medical condition earlier (id.).

12 Finally, Defendants respond to Plaintiff's assertion that the Motion to Dismiss is
13 improper because they cited to Rule 12(b)(6) (id. at 8). Defendants state that the exhaustion
14 issue and the statute-of-limitations issue were both raised in Plaintiff's Second Amendment
15 Complaint, so the matters are not outside of the pleadings (id.).

16 **III.   Exhaustion**

17    **A.   Legal Standard**

18 The PLRA provides that a prisoner may not bring a claim under federal law unless all
19 available administrative remedies have been exhausted. See 42 U.S.C. § 1997e(a); Vaden
20 v. Summerhill, 449 F.3d 1047, 1050 (9th Cir. 2006); Brown v. Valoff, 422 F.3d 926, 934-35
21 (9th Cir. 2005). Exhaustion is required for all suits about prison life, Porter v. Nussle, 534
22 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative
23 process, Booth v. Churner, 532 U.S. 731, 741 (2001). And a prisoner must complete the
24 administrative review process in accordance with the applicable rules. See Woodford v.
25 Ngo, 548 U.S. 81, 92 (2006).

26 Exhaustion is an affirmative defense. Jones v. Bock, 549 U.S. 199, 212 (2007).
27 Therefore, the defendant bears the burden of raising and proving the absence of exhaustion.
28 Wyatt, 315 F.3d at 1119. A challenge to a civil rights action due to nonehxuastion is treated

- 8 -

1 as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion. Id. at
2 1119-20. In addressing an unenumerated Rule 12(b) motion, a court may look beyond the
3 pleadings to decide disputed issues of fact. Id. at 1119-20. When doing so, a court has broad
4 discretion as to the method to be used in resolving the factual dispute. Ritza v. Int'l
5 Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988) (quotation
6 omitted). And if a court concludes that a prisoner did not exhaust available remedies, the
7 proper remedy is dismissal without prejudice. Wyatt, 315 F.3d at 1120.

**B.     Analysis**

9 To the extent that Defendants seek dismissal for nonexhaustion, their Motion to
10 Dismiss will be construed as an unenumerated Rule 12(b) motion. See id. at 1119-20.

11 As stated, Defendants bear the burden to prove nonexhaustion and therefore must
12 demonstrate that there were remedies available to Plaintiff. See id. at 1119; Brown, 422 F.3d
13 at 936-37. Defendants submit evidence that grievance procedures were available at both the
14 CADC and FCC facilities and that Plaintiff received notice of these procedures upon his
15 arrival at each facility (Doc. #26, Ex. 1, Henricks Aff. ¶¶ 4-5; Ex. 2, Partain Aff. ¶¶ 4-5).

16 Plaintiff does not dispute that he did not file any grievances about medical care while
17 he was at CCA. Nor does he dispute that he was aware of the CCA grievance system; rather,
18 he asserts that he was not aware of his injury—permanent loss of eyesight—until February
19 2006 and, therefore, could not have pursued the grievance procedures until that time. The
20 Court finds this assertion unavailing in light of the specific claims set out in Plaintiff's
21 Second Amended Complaint.

22 In Count III, Plaintiff alleged that Jackson violated his Eighth Amendment rights by
23 "depriving him of prescribed medication and failing to schedule and transport [Plaintiff] to
24 regular appointments prescribed by the specialist Dr. Dao" (Doc. #25 ¶ 56). As detailed by
25 Plaintiff, these deprivations occurred between September 2004 and January 2005, when
26 Plaintiff was denied access to Dao and not given the medication Dao had prescribed (id.
27 ¶¶ 20-23). Plaintiff's other counts include allegations, which Plaintiff incorporated into
28 Count III, that Defendants' actions included:

- 9 -

>cutting [Plaintiff's] eye and/or allowing [Plaintiff's] eye to be cut by someone other than a properly qualified eye surgeon, withholding prescribed and necessary medication and treatment, and preventing [Plaintiff] from seeing the eye specialist [and] failing to follow the instructions of ophthalmologist Dr. Dao to return [Plaintiff] for follow-up treatment, failing to provide [Plaintiff] with the medicine prescribed . . . (id. ¶¶ 45, 52, 54).

These events occurred between November 2003 and January 2005 (id. ¶¶ 15-17). Plaintiff would have been aware at the time the events occurred that his eye was cut, he was hospitalized, and he saw a specialist. And even assuming that he was not initially aware that Dao prescribed medication and a follow-up visit at the September 2004 appointment, once he saw Dao in January 2005, and Dao questioned why Plaintiff had not taken the medication or been in earlier for follow-up, Plaintiff would have been aware of Defendants' failure to adhere to the physician's instructions (see id. ¶ 23).

Although Plaintiff may not have been aware of the extent of his injury until later, that was just one of the injuries he claimed to have suffered. In his pleading, he alleged that Defendants' actions caused him "severe harm . . . including the loss of sight in his eye and great and continuing physical pain, and required the need to undergo further and ongoing medical treatment" (id. ¶ 57). Plaintiff would have been aware of pain and the need for further treatment at the time he was cut and denied medications and treatment. Yet he offers no explanation justifying his failure to grieve inadequate medical care while at the CCA facilities. For example, he does not claim that his medical condition prevented him from filing a timely grievance. See Days v. Johnson, 322 F.3d 864, 867-68 (5th Cir. 2003) (administrative remedies are unavailable when a physical injury causes the untimely filing of a grievance), overruled by implication on other grounds, Jones, 549 U.S. at 199; Macahilas v. Taylor, 2008 WL 220364, at *3-4 (E.D. Cal. 2008) (prisoner exhausted available remedies where his illness required hospitalization and lingering effects of that illness were responsible for prisoner's inability to file a timely grievance).

Despite Plaintiff's implication otherwise, his ultimate injury—permanent eye damage—is not the crux of his Eighth Amendment claim, it merely adds support. The basis of the medical care claim against Defendants is their alleged deliberate indifference, which

- 10 -

Plaintiff alleges occurred from 2003-2005 at the CCA facilities. Indeed, even if Plaintiff did not suffer permanent eye damage, his allegations regarding Defendants' actions at CCA and the pain he endured are sufficient on their own to state an Eighth Amendment violation. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (jail officials may be liable for deliberate indifference if they intentionally deny or delay access to medical care); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (deliberate indifference may be shown when an official denies, delays, or intentionally interferes with treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) (an official acts with deliberate indifference when he ignores a prisoner's treating physician's instructions); see also Ortiz v. City of Imperial, 884 F.2d 1312, 1313-14 (9th Cir. 1989) (per curiam).

The holding in Allard v. Anderson is not helpful to Plaintiff, but not for the reason purported by Defendants. In Allard, the inmate was subject to unsanitary conditions and pesticides and discovered later—after his transfer out of the jail—that those conditions caused him to contract hepatitis C and develop a thyroid gland problem, which could lead to birth defects in future children. 260 Fed.Appx. at 712. At the time Allard was at the jail, he could have only filed grievances regarding the unsanitary conditions; he had no medical issue at that time. In fact, the Circuit Court upheld dismissal of Allard's claims related to unsanitary conditions for failure to exhaust because he was aware of those conditions while housed at the jail and could have used the grievance process during his confinement. Id. at 714. But here, Plaintiff's medical issue arose while he was housed at CADC and FCC; his eye-sight damage did not stem from anything other than the alleged inadequate medical care he received at those facilities. And, as referenced above, his "continuing physical pain" and "need to undergo further and ongoing medical treatment" ensued when his eye was cut and he was denied medications and adequate treatment. Thus, the "conditions" that caused Plaintiff's harm—namely, Defendants' actions and omissions—occurred and were known to Plaintiff during his confinement at CCA. Plaintiff was obligated to grieve his complaint at that time.

This conclusion is further supported by the Ninth Circuit's decision in Ngo v.

1 Woodford, 539 F.3d 1108, 1109-10 (9th Cir. 2008). There, the prisoner, Ngo, was informed
2 at a disciplinary hearing that he was barred from participating in prison special programs.
3 Id. at 1109. Ngo did not appeal that decision. Instead, three months later, he requested to
4 participate in special programs, and when the warden denied his request, he appealed the
5 response. Id. The Court held that the limitations period in which to file a grievance began
6 running against the prisoner on the date of the disciplinary hearing—when he became aware
7 of the restriction on participation in special programs—not on the date he actually felt the
8 effects of that decision. Id. at 1110. Although Plaintiff's claim concerns medical care, it is
9 similar to Ngo's claim with respect to Plaintiff's awareness of the conditions and acts (or
10 failure to act) by Defendants and his obligation to initiate the grievance process at that time
11 or shortly thereafter. Accordingly, the grievance and appeals that Plaintiff submitted at the
12 FCI facility in March 2006 are insufficient to demonstrate exhaustion of his claim stemming
13 from medical care received in 2003-2005.

14 One of the primary purposes of the exhaustion requirement is to afford prison officials
15 the opportunity to address complaints prior to a lawsuit, thereby reducing litigation when
16 complaints can be resolved or improving litigation that does occur with the preparation of
17 a useful record. Jones, 549 U.S. at 219. Plaintiff's failure to grieve his medical concerns
18 when he was at CCA deprived officials there of any opportunity to resolve the problem prior
19 to litigation, and it foreclosed any development of an administrative record that could have
20 clarified the dispute.

21 In sum, the Court finds that Plaintiff failed to exhaust available administrative
22 remedies as required under the PLRA. Consequently, Plaintiff's Eighth Amendment claim
23 against Defendants will be dismissed without prejudice.

### IV. Conclusion

25 In light of the Court's determination on exhaustion, it need not address the statute-of-
26 limitations argument as it applies to Plaintiff's Eighth Amendment claim.

27 When federal law claims are eliminated before trial, the court generally should decline
28 jurisdiction over state law claims and dismiss them without prejudice. Gini v. Las Vegas

Metro. Police Dept., 40 F.3d 1041, 1046 (9th Cir. 1994). Therefore, the Court will also dismiss the remaining state law claims.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion to Dismiss (Doc. #26).

(2) Defendants' Motion to Dismiss (Doc. #26) is **granted**; Plaintiff's Eighth Amendment claim in Count III will be dismissed without prejudice for failure to exhaust administrative remedies.

(3) Plaintiff's state-law claims in Counts I and II will be dismissed without prejudice.

DATED this 29th day of April, 2009.

Paul G. Rosenblatt
United States District Judge